Good morning, members of the panel. My name is Michael Welch. I'm here on behalf of the plaintiff and appellant, Vannessa Luu, and I would ask the Court to allow me to reserve three minutes for rebuttal. All right. When there's three minutes on the clock, we'll try to remind each other that you would like to step. Fair enough. Your Honor, the principal issue here, as has been laid out in the briefs, is whether or not there was a causal nexus between the alleged retaliatory acts that were described in great detail in my client's declaration and the adverse employment actions that were then taken as a result of that. I believe the law is settled on this and is not disputed by either side. That is, it's the law that was set forth in Morgan v. Regents of U.C. and in Jordan v. Clark at the Federal level that both hold that a jury can infer causation between engagement in a protected activity and adverse employment action by virtue of, one, the employer's knowledge of that protected activity, and, two, proximity and time between the protected activity and the adverse action. So with that settled, it just becomes a matter, then, of whether or not my client presented sufficient evidence to actually show those two factors. And I would submit, as we pointed out in the brief, there are multiple places where both of those factors are demonstrated. Probably the most succinctly would be in paragraphs 16 and 17 of the declaration, wherein she states that she made direct complaints to Delete Fadke, who was her new manager at the time, that she'd been subjected to retaliation and that she'd complained of discrimination. She also complained about violations of Sarbanes-Oxley to him. She was terminated. That was done in September.  Again, a temporal proximity of barely three months, which is well within the range of myriad cases cited here that allow up to 6 months, even 8 months or 9 months for that time between the protected activity and the adverse actions or the punishment. Sotomayor. She says she, Ms. Liu claims that she repeatedly told her managers about the IPAL groups' discriminatory practices, but did she ever document a single complaint? Yes, because Mr. Flint, her, who was the investigator that was used by HP. But did she ever document a single complaint? Yeah. Mr. Flint testified she did. Oh. In his, in his deposition, which is attached, he stated that he saw e-mails. What are you reading? What excerpt of record are you reading from? It is, just one moment. Pardon me. It's at page 317 of the record, Your Honors. Thank you. He was asked. Of the ER? Of the ER? ER. ER 317. He was asked whether any of the documentation he reviewed showed any complaints by Ms. Liu regarding improper conduct. And he said, yes, there was. And it was only several weeks before her termination. Now, he then tried to put his spin on it by saying, well, it's not uncommon for employees to complain about retaliation and financial misconduct when they have performance issues. So he independently affirmed that she had made those complaints, in addition to her own testimony that she made those complaints. Not just the. But she never, did she ever send a written complaint? It depends on what constitutes a complaint, Your Honor, but she had sent e-mails to people making those complaints that Mr. Flint testified about. She then, she also complained to the same. I'm looking at ER 317. It's unclear what these e-mails were. Are they clearly to the managers, or are they just e-mails in which she's complaining to someone else? I believe he said they were to the managers. Well, complaints, well, I don't know. It doesn't really say who the e-mails were to. Let me ask you a different question. She said she prepared a comprehensive draft report summarizing the discrimination she experienced while working for HP, but I don't understand why the report wasn't included in the record. That was in 2006. For one reason, I don't know that she still had the actual document. The other is that the focus, I would probably agree that in 2006 you would have a time proximity problem between when she prepared that complaint and when she was terminated in 2008. That's why we focused on all of her subsequent complaints, which fell clearly within the allowable time proximity boundaries that are laid out in much of the authority we cited. That is, a series of complaints starting in February 2008 where she complained directly to her manager, Ms. Perry, who made complaints or made remarks that she would prefer to hire men because women have too much drama. And as she states in her declaration, Ms. Liu, she complained then and there to Ms. Perry that that was discriminatory. There were then successive complaints after that culminating in the final one to Mr. Fadke, who became her new manager. Well, let me ask you this, because the record does contain a number of e-mails related to Ms. Liu's poor job performance as described. I guess what specific evidence in the record shows pretext? If you could just outline one or two just for me. Okay. Well, for example, one of the items that was described in 30B6, 30B6 deposition of Molly Perry on behalf of the company, the purpose of which was to ask her to provide all the reasons for Ms. Liu's termination. She said that Ms. Liu messed up these tax withholding certificates. As Ms. Liu's declaration stated, the person responsible for actually handling those and processing those withholding tax certificates was named Anela Wong. Anela Wong was asked to provide a peer review at the end of 2008, as were many other people who worked closely with Ms. Liu. Anela Wong worked closely with Ms. Liu. Ms. Liu reported to her for purposes of the small amount of work that Ms. Liu did to prepare those tax withholding certificates. Anela Wong, in every category, gave Ms. Liu an evaluation that was either strong or excellent, which is completely inconsistent with Ms. Perry's statement that she screwed that up in her relationship with the only task that she was there to do for Ms. Wong. So those are completely contradictory things. Ms. Wong says she did a very good job, yet Ms. Perry says she was so bad that she needed to be fired over it. The claim that Ms. Perry made that she was firing Ms. Liu because she needed to reduce headcount and that Ms. Liu's job was eliminated. Well, Mr. Fadke, again, the subsequent manager that's in the record, testified that her job wasn't eliminated, that they hired somebody else. Shortly after, they terminated Ms. Liu. Wasn't that person doing a lot of different things, though, in addition to what Ms. Liu was doing? Not at the time she was hired. At the time she was hired, her job description, which Ms. Liu attached to her own declaration, Ms. Liu said was the exact same job with the exact same job title that Ms. Liu had. And if you look, Mr. Fadke said later, several months later, she was tasked with to manage the review process for all IP deals. Well, if you look at the job description for which this replacement was hired, that wasn't in the job description. So, yes, it turned out that later on they found she was capable of doing more work, but at the time she was hired, she was hired as a replacement for Ms. Liu. And there was also no reduction in headcount for the same reason. And does she have anything other than her declaration? Yeah. That was Mr. Fadke's testimony. I'm sorry. That was in Mr. Fadke's deposition testimony. He corroborated that. Oh, okay. And that was in ER 172, I believe. The job description attached to the declaration appears to be Ms. Liu's job description. Do we have the job description of the person who was hired after her? She said that was the job description. She downloaded the job description that was posted. That's what that job description was for her replacement. Well, Exhibit 1, the top says it has Vanessa Liu's name at the top of it. So you're saying that's the job description for the replacement? Oh, it's not Exhibit 1. I'm sorry. Exhibit 1 is a performance plan. It was a performance evaluation for 2007. Right. No, it's Exhibit 6 to her declaration, which is at ER 273274, I believe. Okay. I can give another instance for the panel, because almost every one of the items that Ms. Liu rebutted by her own declaration contained corroborating evidence by HP managers or HP personnel who were directly involved with those same job functions. For example, Ms. Perry said that Ms. Liu had failed to prepare a computerized contract repository based on SharePoint. Yet we submitted an e-mail the day of July 23, 2008, from Molly Perry herself, and that was at ER 230231, where during an audit, she's being asked whether or not they have a SharePoint contract repository. And Ms. Perry responds, no, we didn't do one because the legal department decided it wasn't secure and we're still looking at other options, which completely corresponds with what Ms. Liu stated in her declaration. So Ms. Perry says she told her to do a SharePoint in her declaration, to do the SharePoint contract repository, but in a contemporaneous e-mail in 2008, she's explaining to the auditors that she didn't do that, and she's giving the reasons that she didn't do that. And then she's not blaming it on Ms. Liu. She's saying it's her decision or it's the decision of the legal department. And, again, that's three out of the five right there of the main items that were listed by Ms. Perry as the reasons for terminating her. Even on the forecasting issue, Mr. Flint revealed that there were notes that he reviewed by Janet Lee. Janet Lee was the person who was most responsible for handling the forecasting and working with Ms. Liu. Ms. Perry said Ms. Liu screwed up the forecasting. When Mr. Flint was asked about his notes, there was a note from Janet Lee that said, quote, no glaring errors or recurring errors with VL's work. He was then asked, and this reflects the fact that Janet Lee told you there were no glaring errors or recurring errors with Vanessa Lee's work, correct? Answer, that's correct. That's at ER 319. Whereas Ms. Perry's stating, again, she screwed this up horribly. So the people who are closest to Ms. Liu in each of these situations are completely contradicting the managers about and to whom Ms. Liu made the complaints that we allege got her fired. And that we're going to save your remaining time. Yes. I'm sorry, Your Honor. Yes.  Thank you. Good morning, Your Honor and other members of the panel. May it please the Court. Heather Sager of Vetter Price for Appellee Hewlett-Packard. To address the primary points raised by Appellant's counsel, I'd first like to address the issue that counsel identifies as the primary one before the panel. And that is whether Ms. Liu can establish a causal nexus between her alleged protected activity and Hewlett-Packard's decision to end her employment. I believe the panel has appropriately focused, as did the district court, on the absence of admissible, reliable, specific, and substantial evidence to support Ms. Liu's assertion of a causal nexus. What about these items that counsel was just directing us to right now? Well, Your Honor, if the panel reviews the submissions in the record, you will note that all of those assertions are founded on Ms. Liu's self-serving declaration. They're not supported by admissible evidence or objective testimony. But isn't it they've also, there is evidence of reporting about gender discrimination, reporting about hiring practices, about shared ethnic religious. There's documentation that he points out that she also made this financial complaint, you know, a la Sarbanes-Oxley. So there's a whole series of complaints that she made that are in the record. And are you saying all of those are inadmissible? Respectfully, Your Honor, the only evidence of any sort of gender-based complaints, her patriarchal beliefs, the alleged comments by Ms. Perry coming through that declaration, there is no contemporaneous evidence, no written complaints, no calls to the ethics hotline, no discussions with human resources or employee relations on any of those subjects at all. The only admissible evidence of any sort of complaints about purported policy violations, which she characterizes in part as potential Sarbanes-Oxley issues, if you look at the audit report, the auditors say she said SOX, but nothing she discussed implicated SOX at all. But she threw that out there. She threw some other red flag words out there. None of that is established until after she was notified of the WFR. There is no evidence in the record of protected activity prior to that. So what do you mean it was, it occurred before she was terminated, right? The alleged violations or the complaints? The complaints. It occurred before the termination was effected, but after she was notified of the termination decision and after the decision had been finalized and made. But she says that she made these complaints to Perry or to Fodky. I mean, she says that before her termination, not the effective termination, but the original termination, that she was complaining about these things. Now, you're saying that's inadmissible. But why is it not in a hearsay exception? Because she's saying I made these complaints, they're terminating me. The complaints are not being offered for their truth. It doesn't matter whether actually there was gender discrimination. She's saying I said this. And why is that not admissible? I don't believe she actually ever testified to that until she submitted the declaration after the papers had been filed. But that doesn't matter, does it? I mean, her declaration can create a fact dispute, can't it? Fair enough, except the issue here is when the decision was made and who made it and why they made it. So even presuming for the purposes of summary judgment or argument today that she did in fact make some of those complaints prior to being informed of the WFR decision, there's no evidence to refute the legitimacy of that decision or create pretext, which is the second issue. The first is the causal nexus. The second is whether there's a legitimate reason separate and apart from potential temporal proximity or some preceding productive activity. We don't believe there is because the issues that counsel cites as support for Ms. Liu's belief she was performing her job in an acceptable fashion can all be tied back to peer-type reviews or individuals who had very, very limited contact with her. The case law establishes that Ms. Perry, Mr. Fadke, higher-level managers who are in charge of the departments and in charge of selecting individuals for WFR and making those separation decisions are in fact the appropriate people to make those decisions, not lower-level peers. Well, one question about that. I agree that that's how the case law reads. You've got to look at the managers with authority and responsibility and also to the person that may have some impact. But if what they're saying is pretext, how can you ever show that if you can't show that there's somebody in opposition to that in terms of their view of how she's performing? Well, we would argue it's the weight of the evidence, and the Court needs to look at that, the weight of the admissible evidence here. The weight of the evidence on a summary judgment? Well, I mean, that would suggest what you're saying is that would raise a factual issue and we'd go to trial and it'd get sorted out. Well, Your Honor, I would suggest the weight of the undisputed material evidence that was submitted to the Court. And here we have reams and reams of, the panel noted, the volumes of observations about Ms. Liu's performance problems from individuals she did not allege were biased or engaged in discriminatory behavior. In addition, there was a nine-month-long independent investigation into the legitimacy of this termination decision by folks who didn't work with Ms. Liu, who didn't work with Ms. Perry, who didn't work with Mr. Fadke, who had no knowledge of the personalities, the individuals, the purported conflicts, who did an incredibly exhaustive investigation. And it's quite difficult for me to imagine how any employer could ever have been found to have a good-faith reason for termination if, you know, if they've gone through this incredibly complicated process to legitimize that decision upon learning of an employee concern about the legitimacy. So in Plaintiff's opening brief, Plaintiff points to the 30b6 deposition testimony and goes through the reasons given in that testimony and says that they are not true and points to other evidence. Your brief, as I read it, focuses on all the other evidence that suggests that she was doing a terrible job. But I didn't really see you responding directly to the things they said were in the 30b6 deposition testimony and don't they claim don't hold up. Can you respond to those points that were in the 30b6 deposition testimony that were given by that witness as the reasons? Sure. I think Plaintiff's primary argument, and please correct me, Your Honor, if I've misinterpreted your point, I think Plaintiff's primary argument on that was that somehow the fact that HP cited multiple reasons and perhaps cited different reasons in the 30b6 depo than they did when initially communicating the decision somehow suggests that the initial reason was pretextual or false. Well, I think aren't you bound by the 30b6 deposition testimony on behalf of the company? So if those were the reasons given in the deposition testimony, isn't that what we have to look to as the reasons? Yes, but there — and I'm not backing away from those reasons at all. I think our additional focus was to provide the panel with even more justification for — or rather the district court. Do you walk through those then because, for example, the tax reporting? Sure. Well, Ms. Liu, the easiest way to focus on it is to refer the panel back to the audit of the IPL group, which was conducted in 2006. Following that audit, where the group was found to be deficient in a number of administrator position that Ms. Liu was hired to fill to address the shortcomings. There was then a subsequent audit in September 2008 finding — and if you look at what we submitted as her job description and the RACI list, the responsibility list that Ms. Liu helped to draft and specifically adopted, there were specific action items identified in there that were pinpointed to help the IPL group improve its performance in that independent audit. Is the tax issue one of these? Yes, it was. Because I haven't heard the response here yet. Yes, it was. It was. Hence the background. It was. And so that was specifically identified and specifically put in Ms. Liu's bucket list. And if you read the record as a whole and the briefs, you see a picture where Ms. Liu had an idea that she was responsible for the greater whole of the functionality and that the little people, the Janet Leaves of the world, et cetera, were supposed to take ownership of tasks that were really in her buckets, that she adopted via that RACI list at hire. The tax reporting was one of them. There were several others. She just didn't deliver on those because she was so focused on what she perceived to be this grand scheme of improper conduct by the group as a whole and, frankly, HP as a whole, that she wasn't doing her job. So you'll see in the record comments that Ms. Liu misconstrues as threats or things like that, where her managers are consistently telling her, focus on your job. Spend time on your responsibilities. Stop muckraking. You need to do your job. And she just didn't. She consistently did it. She was insensitive. What about the second item where they say that the job description of the person that was hired is actually identical to the one she had and, therefore, she really wasn't, you know, riffed? That's Ms. Liu's speculation. That job description that counsel cites was never posted. That's not a job description that was used for the position that the other Asian female was hired to fill after Ms. Liu's departure. Do we have something else we should look at for the? There was no posted job description for that or posting. There was testimony about that individual's job duties. And the panel was correct in observing, as we submitted, that while that person did assume many of the duties performed by Vanessa Liu, she fulfilled a much greater role. And, in fact, as part of the contraction of the group, you may recall from the submissions that there were two groups that, following the WFRs, became one much larger group with combined functionalities. This individual was hired to fulfill those combined functionalities and, in fact, reported much higher up the chain and was a direct assistant to much higher level executives than Vanessa Liu. That was my understanding from your brief, but now I'm confused because the exhibit he pointed to, what is it then? It was Ms. Liu's job description for a prior position. And it has her name on it, right? Well, wait, I think I was confused about that. Exhibit one has her name on it, but this exhibit eight or seven or whatever it was doesn't, I think. It's a separate job description that's not related to the position that the subsequent Asian female hire held at HP. She also has a number of, during deposition, we looked at the qualifications for both the positions, and this, I don't believe, was in the record at the district court. It may have been at summary judgment, but it's not something that's been focused on in the papers to the panel. This individual had a breadth of much, much broader experience than Vanessa Liu, and I'm not sure that's particularly relevant because counsel conceded on the discrimination claims, so I don't know if the panel wants me to address that. I don't know that it relates to the pretext issue. Why did it take nine months to conduct the internal investigation here? Frankly, Your Honor, each time the investigative audit team was set to close it, Ms. Liu submitted reams of new paper and demanded new discussions and meetings with them, and they didn't want to foreclose any additional submissions that might be relevant to the investigation, so they continued until she started making repeat submissions, and they said to her, we've heard all this, we've seen all this. Is there anything else you want us to consider? It's been going on quite some time. And was there anything, any evidence found to substantiate her discrimination claims? No. Could you point to where in her job description it talks about this tax certificate duty? I'm just not sure where to look for that. Yes. Give me one moment, Your Honor. It is in the RACI, and I need to find you the citation to the record for that. Okay. If you look at HP's record, excerpts of record at 267 through 270, I believe that's the RACI update that Ms. Liu adopted. And also, excerpt of record 134, Molly Brass's declaration, she's the woman who worked primarily in the tax and accounting functionality, who worked directly with Ms. Liu to divvy up those responsibilities following the audit report. That led to both Ms. Brass and Ms. Liu's focus on improving in the areas in which IP had previously failed audit. So it says obtained tax withholding exemption certificates. Is that the job duty that we're talking about that they say was Ms. Wong's and you say was Ms. Liu's? That's correct. The additional areas in which she was found significantly deficient were creating the contract database, tracking contracts, auditing and reconciling revenue reports, which directly led to the light scribe situation that caused a multimillion-dollar loss to the group. That was in part because Ms. Liu failed to audit, track, and reconcile the revenue related to that account, which is directly identified in that job duty recitation I just referred the panel to. Thank you. Thank you. Your Honors, you were asking about the job description that Ms. Liu attached to her declaration, and counsel was suggesting that it was Ms. Liu's own original job description. In her declaration, she says that she's attached as of Exhibit 6. The job listing, and it was dated December 28th, 2008, less than one month after I was notified I would be terminated as part of a WFR. So she's saying in her declaration this wasn't hers. This was the replacement job description that was dated almost immediately, a month after she was terminated. As far as all the stuff about light scribe problems and so forth, again, none of that was ever raised in the 30B6 deposition. In fact, this kind of stuff falls in the category of evidence that the case law we cited actually raises trial issues because when people either change their defenses or add to their defenses in the course of litigation, that's generally deemed to be or having a moving target, as it were, that these aren't credible reasons, especially when she has taken each single one and specifically rebutted it. And in response, all you heard was a general she just wasn't a good worker kind of response. No focus on any of the specific items that we went through in detail on this. I want to add one more thing. There's this whole business of the squirrely 2008 performance review. Again, that's the kind of thing that also can raise serious questions about credence. She was supposed to get her performance review, which was the basis, supposedly, for terminating her. She had a bad performance review. But they never did her performance review. The investigators asked Mr. Fadke, where's her performance review for 2008? We want to see it. And this is also in Mr. Flint's depo testimony. He asked for two weeks. Where is it? Where is it? Well, Mr. Fadke didn't create it until three months after they terminated her. This is after the fact. It's basically conformed now after the fact to match the reasons that they want to give her for terminating her after she's asked for an investigation. How did he assign the rating, though? He just hadn't written up the full performance review. I'm sorry. How did he assign the rating, the low rating? He just hadn't written up the full description. How did he assign it? No, didn't he assign the rating in October or November, even though he didn't write up the explanation until later? That's what he said, but it was a practice there. It's been testified to do them both at the same time. And not even doing a performance evaluation that would justify that rating makes it suspect on its face. And then if you don't do it, then say you don't do it. Don't then dummy up or phony up one three months later and try to pass it off as one you did earlier. And, by the way, even the job description or even the ratings is evidence, again, of retaliation. Because she had P's, strong P's, 2006-2007. It wasn't until she started this series of complaints in early 2008 that she went from having a strong meet and exceeds expectation of a P to suddenly having the worst rating of the entire group, as they even said themselves, to an I. Yet she's doing the same work. She's got good peer reviews. All the other evidence that we've cited shows she's doing everything she was doing before, and it's only after the complaints that she suddenly has the worst rating in the entire group. Again, that's not evidence in favor of them. Those are evidence of triable issues of fact here. And it's not about the weight of the evidence. It's about whether or not my client has put forth sufficient evidence for somebody who can, independent person, to judge the credibility, not the weight, not the mass. But who's telling the truth here? Whose story is more credible? Thank you. Thank you. I thank both counsel for your argument this morning. The case of Vanessa Liu v. Hewlett-Packard is submitted.
judges: McKeown, Murguia, Friedland